**NATIONAL BROADCASTING COMPANY, INC., Plaintiff–Appellee,**

v.

**COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, Defendant–Appellant.**

No. 87–5658.

United States Court of Appeals, Eleventh Circuit.

Nov. 28, 1988.

James B. Coppess, Adair, Scanlon & McHugh, P.C., Washington, D.C., Atlanta, Ga., for defendant-appellant.

Averill G. Marcus, Manas & Marcus, P.A., Miami, Fla., Floyd Abrams, Cahill, Gordon & Reindel, New York City, for plaintiff-appellee.

Before TJOFLAT and HILL, Circuit Judges, and WARD *, District Judge.

HILL, Circuit Judge:

From July 23 to August 1, 1987, the Communications Workers of America, AFL–CIO (CWA) leased the Miami Beach Convention Center for an annual convention. Several candidates for President of

---

* Honorable Horace T. Ward U.S. District Judge for the Northern District of Georgia sitting by designation.

the United States were slated to speak at the convention on July 28 or July 30.

At the time the company convention was being held, employees of National Broadcasting Company, Inc., (NBC) who were represented by the National Association of Broadcast Employees and Technicians, AFL–CIO, struck against NBC. While CWA admitted various members of the press, in solidarity with the striking NBC employees CWA refused to grant NBC access to the July 28 speeches.

On July 29 NBC filed suit to enjoin CWA from excluding it from meetings to which other media organizations were admitted. That same day the district court entered a temporary restraining order (TRO) against CWA; the district court denied a motion for a stay, and this court denied a motion for a stay of the TRO pending appeal to this court. CWA chose to comply with the order by excluding all news media from the July 30 meetings.

## I. MOOTNESS

■ NBC insists that CWA's appeal is now moot. If the appeal is moot, this court lacks jurisdiction to decide the case because it fails to meet the case or controversy requirement set forth in U.S. Const. art. III, § 2.

Because the convention has ended and the TRO has expired, we must find the case moot unless it falls within one of the exceptions to the mootness doctrine. Courts have agreed to hear otherwise moot cases in three instances: (1) "where the issues are capable of repetition, yet evading review"; (2) "where an appellant has taken all steps necessary to perfect the appeal and to preserve the status quo before the dispute becomes moot"; and (3) "where the trial court's order will have possible collateral legal consequences." *B & B Chemical Co. v. United States E.P.A.*, 806 F.2d 987, 990 (11th Cir.1986).

CWA does not contend that this case ought to fall within the third exception.

Because we find that the present appeal falls within the first exception, we need not address the arguments presented by the parties as to the second.[1]

In the absence of a class action, a case may be considered within the "capable of repetition, yet evading review" exception only where: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 348–49, 46 L.Ed.2d 350 (1975). As even NBC appears to concede, this case falls within the first half of the standard: the issue cannot be fully litigated in the time between the exclusion of NBC and the occurrence of the "newsworthy" event. In a case binding on this court, the Fifth Circuit suggested that economic strikes of the type present in that case will "rarely last long enough to permit complete judicial review of the controversies they engender." *United Steelworkers of America, AFL–CIO v. Bishop*, 598 F.2d 408, 412 (5th Cir. 1979). While the facts available on appeal do not specify whether the strike was an economic one, the combination of time limits inherent in the strike, convention, and newsworthy event formulate a preclusively accelerated time schedule.

NBC maintains that while this appeal may evade review, it is not capable of repetition. We disagree. The Supreme Court has explained that the standard may be met by controversies "based on expectations that, while reasonable, were hardly demonstrably probable." *Honig v. Doe and Smith*, —— U.S. ——, —— n. 6, 108 S.Ct. 592, 601 n. 6, 98 L.Ed.2d 686 (1988). CWA holds a convention each year, and holds other meetings throughout the year. Because of CWA's size, we expect the union often will be forced to conduct its meetings in public facilities; because of its size and political interests, we anticipate that

1. Given this circuit's decision in *In re Sewanee Land, Coal & Cattle, Inc.*, 735 F.2d 1294 (11th Cir.1984), we are dubious as to whether plaintiff could have prevailed in arguing that a failed attempt to obtain a stay constitutes "all steps necessary to perfect the appeal." *B & B*, 806 F.2d at 990.

the union will frequently attract speakers of public note. Periodically NBC will renegotiate agreements with various unions. It is reasonable to expect that at some point in the future turbulent renegotiations will coincide with a CWA meeting featuring speakers of public import.[2] As NBC illustrated with the opinions it attached to its brief in this court, NBC has sought emergency injunctive relief in similar situations in the past, and we can expect the network to do the same in the future.

We believe it would be contrary to Supreme Court precedent to dismiss this case merely because CWA complied with an injunction which has now expired. *See, e.g., United States v. New York Tel. Co.*, 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977) (due to "capable of repetition, yet evading review" exception, case was not moot even though telephone company had complied with court order to provide FBI with leased lines, and even though district court order had since expired); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) (although district court gag order had expired by its own terms, and Nebraska Press Association had not violated the order, Court found the case fit within the "capable of repetition, yet evading review" exception to the mootness doctrine); *Carroll v. President & Com'rs of Princess Anne*, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968) (particularly in light of fact that courts should encourage compliance with court orders, controversy held not moot even though political group appealed restraining order that had expired, and even though political group had not held rally in violation of the injunctive order). The *Carroll* Court found it could "not say that [the political group's] case is moot," *Carroll*, 393 U.S. at 179, 89 S.Ct. at 350, given that it had earlier held that "[t]he proper procedure ... was to

seek judicial review of the injunction and not to disobey it, no matter how well-founded [the group's] doubts might be as to its validity." *Id.*

Consequently, we find this appeal not moot because the issue presented is capable of repetition, yet evades review.

## II. THE STATE ACTION QUESTION

■ NBC claims that CWA denied NBC's "First Amendment rights to free speech and free press and Plaintiff's Fifth Amendment rights to equal privileges/protection and due process...." R1–1–5 at ¶ 16. The Fourteenth Amendment, and, through it, the First and Fifth Amendments, do not apply to private parties unless those parties are engaged in activity deemed to be "state action." *Jackson v. Metropolitan Edison Company*, 419 U.S. 345, 349, 95 S.Ct. 449, 452–53, 42 L.Ed.2d 477 (1974). The district court concluded that CWA engaged in state action when it excluded NBC from the convention.

■ The district court based its decision in part on a provision in the lease agreement between CWA and the city. The lease agreement contained a paragraph stipulating:

13) Sale of Concessions: Lessor reserves, and at all times shall have the sole right to sell or give away librettos, flowers, refreshments, beverages, cigars, cigarettes, candies, sandwiches, sundries, programs and periodicals and to rent and sell opera glasses, umbrellas and other articles, to conduct check rooms, to control event programs and to supervise the contents thereof, to take photographs, to control or supervise radio, movie and/or television broadcasting or recording and transcription rights and equipment, and other privileges, and Lessee shall not engage in or undertake the sale of any of

---

2. The Supreme Court has acknowledged that labor conflicts are the sort of disagreements likely to be repeated in the future. *See, e.g., Buffalo Forge Co. v. U. Steelworkers of America, AFL–CIO*, 428 U.S. 397, 403 & n. 8, 96 S.Ct. 3141, 3145–46 & n. 8, 49 L.Ed.2d 1022 (1976). *See also, Jacksonville, Etc. v. Intern. Longshoremen's Ass'n*, 457 U.S. 702, 704 n. 1, 102 S.Ct. 2672, 2676 n. 1, 73 L.Ed.2d 327 (1982) (live controversy remained even when union complied with order to load cargo, since union might resume its work stoppage as to other cargo); 13A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3533.3 at 287 (1984) ("labor disputes ... provide clear illustration of the private disputes that are preserved from mootness by the prospect of future repetition").

the aforesaid articles or privileges, without the express written consent of Lessor.

R1–11 (emphasis in original). The court concluded that the contract provision provided a "degree of control and supervision" which "meets both the nexus test and the joint action test" used to establish state action. R1–8–6.[3] The court's final order explained that "the City of Miami Beach must have expressed its consent pursuant to the lease agreement," R1–8–6, when CWA excluded NBC. The district court additionally grounded its finding of state action on its determination that the convention center was a "public facilit[y]." R1–8–6.

We disagree with the district court's finding that the exclusion of NBC constituted state action. The Fourteenth Amendment "erects no shield against merely private conduct, however discriminatory or wrongful." *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). The Supreme Court has offered several criteria to be used in sorting private from state conduct. In reviewing the different standards, the Court has explained: "[m]ost fundamentally, this Court has held that a government 'normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government].' " *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*,

— U.S. ——, ——, 107 S.Ct. 2971, 2986, 97 L.Ed.2d 427 (1987), *citing Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785–86, 73 L.Ed.2d 534 (1982).[4]

In this case the City of Miami Beach neither encouraged nor coerced the exclusion of NBC. In fact, NBC's complaint admitted: "under a lease ... control over access to the facility and security is under the control of the lessee, CWA, and not the City," R1–1–3 at ¶ 8; and "[d]efendant, in its sole discretion, determines which news gathering organizations will be credentialed and permitted access...." R1–1–5 at ¶ 13.

The district court suggested that CWA's actions constituted state action merely because CWA held its convention in a public building; we disagree. "Mere approval of or acquiescence in the initiatives of a private party is not sufficient...." *Blum*, 457 U.S. at 1004, 102 S.Ct. at 2785–86. *See also San Francisco*, — U.S. at ——, 107 S.Ct. at 2986. Moreover, as the Fifth Circuit has held, "the sharing of space [by government and private actors] is not alone sufficient in this case." *Frazier v. Board of Trustees of Northwest Miss.*, 765 F.2d 1278, 1288 n. 21, *modified on other grounds*, 777 F.2d 329 (5th Cir.1985), *cert. denied*, 476 U.S. 1142, 106 S.Ct. 2252, 90 L.Ed.2d 697 (1986) (discharged respiratory therapist not entitled to § 1983 relief because insufficient state action linked a county hospital to the therapist's employer, a private corporation providing respiratory care at the hospital). Two cases binding on

---

**3.** NBC errs in suggesting that we must accept the district court's interpretation of the lease. We interpret the language " 'afresh' as a matter of law." *Eatmon v. Bristol Steel & Iron Works, Inc.*, 769 F.2d 1503, 1518 (11th Cir.1985). *See also Chapman v. Orange Rice Mill. Co.*, 747 F.2d 981, 983 (5th Cir.1984).

**4.** As the Fifth Circuit has explained: "[i]f a thread of commonality is to be drawn from the various forms in which state action can manifest itself through the conduct of private parties, it is that attribution is not fair when bottomed solely on a generalized relation with the state. Rather, private conduct is fairly attributable only when the state has had some affirmative role, albeit one of encouragement short of compulsion, in the particular conduct underlying a claimant's civil rights grievance." *Frazier v.*

*Board of Trustees of Northwest Miss.*, 765 F.2d 1278, 1286, *modified on other grounds*, 777 F.2d 329 (5th Cir.1985), *cert. denied*, 476 U.S. 1142, 106 S.Ct. 2252, 90 L.Ed.2d 697 (1986).

While specifically the *Blum* court spoke of holding the state liable pursuant to state action doctrine, the standard remains constant when a party seeks to hold a private actor liable under the state action doctrine. In *San Francisco*, for example, the Court cited and applied the *Blum* language even though the suit at issue was directed against a private corporation, the United States Olympic Committee. *San Francisco*, — U.S. at ——, —— 107 S.Ct. at 2984, 2986. In fact, *Blum* supported its holding by citing a case called *Jackson*, 419 U.S. at 357, 95 S.Ct. at 456–57, in which a customer sued a privately-owned utility.

us have reached the same conclusion. *See Golden v. Biscayne Bay Yacht Club*, 530 F.2d 16 (5th Cir.), *cert. denied*, 429 U.S. 872, 97 S.Ct. 186, 50 L.Ed.2d 152 (1976) (no state action where private yacht club operated its docks on bay bottom land leased from the city for $1 per month); *Greco v. Orange Memorial Hospital*, 513 F.2d 873 (5th Cir.), *cert. denied*, 423 U.S. 1000, 96 S.Ct. 433, 46 L.Ed.2d 376 (1975) (no state action where private hospital operated on land leased from the county).

Having explained in general terms why we cannot find state action in this case, we turn to a standard-by-standard explanation for our decision. We have discerned three primary tests used by the Supreme Court in evaluating state action: (1) the public function test; (2) the state compulsion test; and (3) the nexus/joint action test.[5] The Court itself has queried "[w]hether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in such a situation...." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939, 102 S.Ct. 2744, 2754–55, 73 L.Ed.2d 482 (1982).

The public function test for state action has been limited strictly, and covers only private actors performing functions "traditionally the exclusive prerogative of the State." *Jackson*, 419 U.S. at 353, 95 S.Ct. at 454–55. *See also Rendell–Baker*, 457 U.S. at 842, 102 S.Ct. at 2772. Selecting

media stations to cover a speech has never been an exclusive function of the government, nor has constructing and renting space in which to conduct meetings. Consequently, this situation does not fit within the public function definition of state action.

The state compulsion test mirrors the *Blum* language which limits state action to instances in which the government has coerced or at least significantly encouraged the action alleged to violate the Constitution.[6] *See San Francisco*, —— U.S. at ——, 107 S.Ct. at 2986; *Blum*, 457 U.S. at 1004, 102 S.Ct. at 2785–86. While the district court found that "the City of Miami Beach must have expressed its consent [to the exclusion of NBC] pursuant to the lease agreement," R1–8–6, that finding is unsubstantiated by any evidence in the record. As *Golden* and *Greco* illustrate, the mere existence of a lease cannot amount to coercion or significant encouragement sufficient to implicate the city in the decision made by CWA. NBC did not attempt to demonstrate that the city entered into the decision-making process which resulted in the decision to exclude NBC, and in fact the broadcasting company alleged the opposite in its complaint. We cannot conclude that the state compelled CWA's action in this case.

■ Finally we address the question as to whether "the State had so far insinuated

---

5. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939, 102 S.Ct. 2744, 2754–55, 73 L.Ed.2d 482 (1982) separated the nexus and joint action tests, but a more recent Supreme Court case has merged the two. *See Francisco*, —— U.S. at —— n. 29, 107 S.Ct. at 2986 n. 29. *See also Jackson*, 419 U.S. at 357–58, 95 S.Ct. at 456–57.

*Lugar* suggests that courts preface the inquiry into the standards we mention by asking whether the complaining party has suffered a "deprivation ... caused by the exercise of some right or privilege created by the State...." *Id.* at 937, 102 S.Ct. at 2753. Arguably NBC suffered no such state-driven deprivation because CWA's right to meet was not created by the city, and in fact could have been exercised in a private building. We question whether *Lugar*'s initial test still exists, however, in light of the fact that recent Supreme Court cases have not mentioned or used it. We need not address the issue as we decide that the circumstances of this case do not

meet any of the subsequent tests for state action.

The Court has rejected the use of several other factors as litmus tests for state action: state regulation, even if it is extensive, *Jackson*, 419 U.S. at 350, 95 S.Ct. at 453; receipt of public funds, *Rendell–Baker v. Kohn*, 457 U.S. 830, 840, 102 S.Ct. 2764, 2770–71, 73 L.Ed.2d 418 (1982); Congressional grant of a corporate charter, *San Francisco*, —— U.S. at ——, 107 S.Ct. at 2985; and, conferral of enforceable trademark rights. *Id.* These factors cannot mandate any decision, and NBC has not argued that any of the four should influence our evaluation of the state action question in this case.

6. The test has been used both separately and as an encompassing description of the state action standard itself. *See, e.g., Blum*, 457 U.S. at 1004, 102 S.Ct. at 2785–86. *San Francisco*, —— U.S. at ——, 107 S.Ct. at 2986. We use the test in both its contexts in this case.

itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." *Jackson,* 419 U.S. at 357–58, 95 S.Ct. at 456–57. To charge a private party with state action under this standard, the governmental body and private party must be intertwined in a "symbiotic relationship." *Id.* at 357, 95 S.Ct. at 456–57. Recently the Supreme Court has suggested that the symbiotic relationship must involve the alleged constitutional violation. *San Francisco,* —— U.S. at —— n. 29, 107 S.Ct. at 2986 n. 29.

NBC suggests that we rely on an early state action case, *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). In *Burton* a privately-owned restaurant operating in a state-owned and state-financed parking lot was enjoined from refusing to serve the plaintiff, a black man. The Court found that the restaurant and state enjoyed "an incidental variety of mutual benefits," *id.* at 724, 81 S.Ct. at 861, and that "in view of [the restaurant's] affirmative allegation that for it to serve Negroes would injure its business, ... profits earned by discrimination not only contribute to, but also are indispensable elements in, the financial success of a governmental agency." *Id.*

As this court has explained in another case, "[a]bsent close scrutiny one might argue that Burton v. Wilmington Parking Authority controls the instant appeal." *Greco,* 513 F.2d at 879. In *Greco* a physician sued a private hospital located on land leased from the county. The court explained that: "[t]he most obvious distinguishing factor is that Orange Memorial Hospital [unlike the restaurant in *Burton* ] is not accused of racial discrimination.... The concepts developed in this area, ... were necessarily broadly drawn in order to implement Congressional intent in circumstances of positive and frequent state obfuscation and delay." *Id.* Furthermore, the court observed that: "[t]here is ... no indication, as there was in *Burton v. Wilmington Parking Authority* that the benefits accruing to the county were directly attributable to the objectionable activities of a joint venturer." *Id.* at 880. The *Greco* court observed that in *Burton* the restaurant owner claimed that the discrimination increased profits and thus rental income for the state. *Id.* The *Greco* court also observed that no nexus connected the county to the challenged hospital policy. *Id.*[7]

All three major distinctions drawn by the *Greco* court apply here. The lease signed by the two parties is not to the contrary. First, the lease clearly relates, as its title states, to city control over "Sale of Concessions." A fair reading of the lease leads to the conclusion that the city was attempting to control the money received from broadcasting rights, not the choice of whether to broadcast or of the networks to be allowed to broadcast. If the parties had had a different understanding of the allocation of decision-making responsibility, the contract indicates that the city would have had to give its approval in writing. NBC does not claim the city gave such approval, and does not attempt to produce the city's written permission allowing the exclusion of NBC.[8]

---

7. *Greco* also distinguished *Burton* on the grounds that in *Burton* the state was charged with providing maintenance and utilities for the restaurant; in *Greco,* the hospital lacked a day-to-day physical relationship with the county. *Greco,* 513 F.2d at 880. Secondly, the *Greco* court noted that the county had "retained no power to amend," *id.* at 881, the hospital policy being challenged.

Applying the first factor to this case is difficult: because any other arrangement would be impracticable, both public and private lessors typically perform maintenance and provide utility services for premises leased for only short-term periods. The day-to-day choices as to how to run the CWA convention were left to CWA, however. NBC alleged that the decision to ad-

mit particular news agencies was made by "[d]efendant, in its sole discretion." R1–1–5 at ¶ 13. We conclude that this factor is virtually irrelevant in the context of this case, but that on balance it militates against a finding of state action.

As to the second factor, our reading of the contract illustrates that the City of Miami Beach did not reserve the right to control CWA's fundamental decisions as to broadcasting and broadcasters.

8. Essentially NBC demands that we read the contract as an agreement that the city could have forced CWA to televise nationally its private meeting or to forego coverage of events for which CWA wanted media attention. That un-

Secondly, even if the city had approved the exclusion, "[m]ere approval ... or acquiescence," *Blum*, 457 U.S. at 1004, 102 S.Ct. at 2785–86, is insufficient to constitute state action.

While *Jackson* mentioned in dictum that the holding of *Burton* should be limited "to lessees of public property," *Jackson*, 419 U.S. at 358, 95 S.Ct. at 457, *Burton* itself refused to extend its holding even to all lessees of public property:

> Because readily applicable formulae may not be fashioned, the conclusions drawn from the facts and circumstances of this record are by no means declared as universal truths on the basis of which every state leasing agreement is to be tested. Owing to the very "largeness" of government, a multitude of relationships might appear to some to fall within the Amendment's embrace, but that, it must be remembered, can be determined only in the framework of the peculiar facts or circumstances present.

*Burton*, 365 U.S. at 725–26, 81 S.Ct. at 861–62. The factual circumstances of this case will not support the same conclusion reached in *Burton*. We see no nexus or joint action sufficient to constitute state action.

Because we find no state action we cannot use the First Amendment to invalidate CWA's choice to exclude NBC. Thus, we need not address the question of whether NBC's First Amendment rights would have been violated had it been the sole network excluded on July 30, 1987.

The decision of the district court is

REVERSED.

TJOFLAT, Circuit Judge, dissenting:

## I.

The appellant, the Communication Workers of America (CWA), is a national labor organization. CWA leased the Miami Beach Convention Center from the City of Miami Beach for the period July 23 through August 1, 1987, for the purpose of holding its annual convention there. A number of candidates for the Presidency of the United States were scheduled to speak at CWA's convention on the evenings of July 28 and 30.

On July 28, the national television networks sent broadcast crews, consisting of cameramen and reporters, to the convention center to videotape the candidates' speeches. CWA issued press credentials and granted admission to all of the network crews except the one from the National Broadcasting Corporation (NBC), the appellee. CWA refused to issue press credentials to NBC because NBC was refusing to accede to the demands of the National Association of Broadcast Employees & Technicians (NABET), the labor union that represented a number of NBC employees who were on strike. CWA advised NBC that it was taking such action to support the striking employees.

On the morning of July 29, NBC brought this action against CWA, seeking preliminary and permanent injunctive relief and money damages under 42 U.S.C. § 1983 (1982). NBC alleged that CWA's decision to exclude NBC from the convention hall violated its right to freedom of the press guaranteed by the first and fourteenth amendments,[1] and asked the court to order CWA to issue it press credentials so that it could videotape the candidates' speeches scheduled for the following evening, July 30.

Later in the morning, the district court convened a hearing on NBC's application for a preliminary injunction. NBC established the historical facts recited above, and after hearing argument of counsel for

likely reading contradicts the clear intention of the provision. Moreover, in this case the city never exercised the power NBC claims it reserved; the city, therefore, did not coerce or significantly encourage CWA's decision.

1. NBC alleged that CWA, in barring NBC from the convention center, acted under color of state law. NBC based its allegation on the provision of CWA's lease with the city which provided that the city retained the right "to control or supervise ... television broadcasting or recording" within the convention center. According to NBC, CWA was exercising this right on behalf of the city when it excluded it from the center.

the parties, the court issued an injunction.[2] It ordered CWA either to admit NBC to, or to exclude all other networks from, the convention center the next evening, July 30. CWA immediately filed a notice of appeal, and then moved the district court to stay its injunctive order pending our disposition of the appeal. The district court denied the motion. CWA thereafter sought a stay from this court, which was denied the next morning, July 30. On the evening of July 30, CWA chose to comply with the district court's injunctive order: it excluded all networks from the convention center during the candidates' speeches.

### II.

The first question this panel must decide is whether we can entertain CWA's appeal. Article III, section 2, of the Constitution restricts the jurisdiction of the federal courts to actual "cases or controversies." For constitutional purposes, a case or controversy does not exist if the court cannot grant the aggrieved party the relief it seeks, that is, the court is unable to remedy the injury the aggrieved party has suffered. *See DeFunis v. Odegaard*, 416 U.S. 312, 316, 94 S.Ct. 1704, 1705–06, 40 L.Ed.2d 164 (1974); *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971). In such a situation, it is said that the case is "moot." The moment a case becomes moot, whether during proceedings in the trial court or on appeal, the court loses its authority to act and must terminate the litigation. *See DeFunis*, 416 U.S. at 319, 94 S.Ct. at 1707.

It is basic hornbook law that a party's compliance with an injunctive order may render the case moot. Suppose, for example, that a trial court enjoins a party in a case to perform an act which, if performed, could not be undone. The party takes an appeal from the injunction, and pending the appeal the party performs the act. His performance of the enjoined act has ended the controversy; the appellate court can do nothing to help him and must dismiss the appeal. *See, e.g., Honig v. Students of the Calif. School for the Blind*, 471 U.S. 148, 149, 105 S.Ct. 1820, 1821, 85 L.Ed.2d 114 (1985); *Newman v. Alabama*, 683 F.2d 1312, 1317 (11th Cir.1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 346 (1983); *Bagby v. Beal*, 606 F.2d 411, 414 (3d Cir.1979); *see generally* C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3533.2 (1984 & Supp.1988).

The majority concedes that there is no relief we can afford CWA; CWA, having complied with the district court's injunction, has mooted the case. *See, e.g., Students of the Calif. School for the Blind*, 471 U.S. at 149, 105 S.Ct. at 1821. Nonetheless, the majority holds that even though the case is moot, it has jurisdiction to hear this appeal because the case falls within the "capable of repetition yet evading review" exception to the mootness doctrine.[3] *See ante* at 1029. In my view, the controversy before us—the validity of the district court's injunctive order—is not capable of repetition, nor does it evade review. The case is therefore moot, and I would dismiss this appeal.

---

**2.** As the majority correctly states, the district court labeled its dispositive ruling a "temporary restraining order." I would have labeled it a preliminary injunction because it did not merely preserve the status *quo ante,* the traditional purpose of a temporary restraining order; rather, it required an affirmative act on the part of CWA. *See Zardui–Quintana v. Richard,* 768 F.2d 1213, 1215 n. 7 (11th Cir.1985). "This court's jurisdiction, therefore, is based upon 28 U.S.C. § 1292(a)(1) (1982) under which preliminary injunctions are reviewable, even when characterized as temporary restraining orders." *Id.* (citing *Fernandez–Roque v. Smith,* 671 F.2d 426, 429–31 (11th Cir.1982)).

**3.** Conceptually, I have difficulty with the notion that "capable of repetition yet evading review" is

an "exception" to the mootness doctrine. I believe that a case is either moot or it is not. The "capable of repetition yet evading review" doctrine merely defines those situations in which a seemingly moot case still meets article III's requirement of a genuine, concrete controversy. Where the conduct complained of has ceased for the time being but a demonstrated probability exists that it will recur, a concrete controversy between parties with a personal stake in the outcome continues to exist; "Art. III is no more violated than it is violated by entertaining a declaratory judgment action." *See Honig v. Doe,* —— U.S. ——, 108 S.Ct. 592, 613, 98 L.Ed.2d 686 (1988) (Scalia & O'Connor, JJ., dissenting).

## A.

A dispute is not "capable of repetition," unless "there [is] a 'reasonable expectation' or a 'demonstrated probability' that the same controversy will recur" between the same two litigants. *See, e.g., Honig v. Doe,* — U.S. —, —, — n. 6, 108 S.Ct. 592, 601 n. 6, 98 L.Ed.2d 686 (1988); *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1184, 71 L.Ed.2d 353 (1982); *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975). "Demonstrated probability," however, does not mean that the chance of recurrence is more likely than not, *see Honig v. Doe,* — U.S. at — n. 6, 108 S.Ct. at 601 n. 6; rather, the chance of recurrence need only be substantial, not speculative.

For the present dispute to recur, the following must transpire: (1) CWA must lease a government facility; (2) the lease must reserve to the government the right "to control or supervise ... television broadcasting or recording" within the facility; (3) CWA must give the television media access to its proceedings; and (4) CWA must refuse to grant such access to NBC. The chance that all of these events will recur is, quite obviously, highly remote, at best.

The majority states that the controversy here is nonetheless "capable of repetition" because "NBC has sought emergency injunctive relief in similar situations in the past [against other defendants, and] we can expect the network to do the same in the future." *Ante* at 1024. That NBC has in the past sought, and may in the future seek, injunctive relief to gain access to a facility is of no moment. The "capable of repetition" test is not satisfied unless there is a "demonstrated probability" or "reason-

able expectation" that the *same dispute* will recur between the *same parties.* No such showing has been made here.

## B.

The majority holds that an injunction "evades review," and thus an appeal therefrom must be entertained, if appellate review cannot be completed before the enjoined act is to be performed.[4] In other words, an enjoined party has a right to have the appellate court decide the validity of the injunction entered against him even though he has performed the enjoined act and the appellate court is powerless to afford him any relief. Such a holding makes a mockery of article III's "case or controversy" requirement. The holding is reached, I believe, because the majority fails to recognize that a party can *always* obtain appellate review of an adjudicative order that enjoins him to perform an act, as the following discussion illustrates.

Assume that a trial court enjoins a party to perform a specific act. In such a situation, the party has two choices. First, he can comply with the trial court's order. If he does, he ends the controversy.[5] *See, e.g., Students of the Calif. School for the Blind,* 471 U.S. at 149, 105 S.Ct. at 1821; *Burnett v. Kindt,* 780 F.2d 952, 954–55 (11th Cir.1986); *Newman v. Alabama,* 683 F.2d 1312, 1317 (11th Cir.1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 346 (1983).

Second, the party can refuse to comply with the trial court's injunctive order and take an appeal.[6] If he pursues this course and the injunctive order is not stayed pending the appeal, the party runs the risk of being held in civil contempt and subjected

---

**4.** As the majority observes, CWA's appeal from the district court's injunctive order could not have been "fully litigated in the time between the exclusion of NBC and the occurrence of the 'newsworthy' event." *See ante* at 1023.

**5.** This is true if, as posited in the text, the enjoined act is a single event that cannot be undone. If, however, the act can be undone and the enjoined party restored to the status *quo ante* or its equivalent, or if the enjoined act calls for a performance that would continue beyond the time necessary to complete appellate review

of the injunctive order, then the controversy—notwithstanding the enjoined party's compliance with the order—remains live for article III purposes.

**6.** If the party complies with the order before the appeal is completed, however, he will end the controversy and moot the appeal. *See DeFunis v. Odegaard,* 416 U.S. 312, 319, 94 S.Ct. 1704, 1707, 40 L.Ed.2d 164 (1974); *see also University of Texas v. Camenisch,* 451 U.S. 390, 394, 101 S.Ct. 1830, 1833, 68 L.Ed.2d 175 (1981).

to a coercive sanction, usually a fine or incarceration, for refusing to comply with the order. Should civil contempt proceedings be initiated and a coercive sanction imposed, he will have to reassess his position and decide once again whether to perform the enjoined act. If he performs it, he can avoid the sanction, but he will moot his appeal. To obtain appellate review of the injunctive order, then, the party will have to suffer the sanction unless its execution is stayed to permit him to appeal the contempt adjudication. Contrary to the majority's view, suffering a contempt adjudication is a well-recognized means of preserving appellate review of an injunctive order. *See B & B Chem. Co. v. United States Environmental Protection Agency,* 806 F.2d 987, 990 (11th Cir.1986); *Boston Teachers Union, Local 66 v. Edgar,* 787 F.2d 12, 18 (1st Cir.1986); *Burnett v. Kindt,* 780 F.2d 952, 955 (11th Cir.1986); *Bagby v. Beal,* 606 F.2d 411, 414 (3d Cir. 1979); *see also Pierce v. Winograd,* 757 F.2d 714, 716 (5th Cir.1985) (A good faith test of a court's injunctive order through noncompliance implies no disrespect toward the court. "Rather, such a test of the court's order is consistent with the highest standards of the legal profession.").

Thus, an enjoined party has two separate means of obtaining appellate review of the injunctive order that has been entered against him. The first is an appeal from the injunctive order itself. The second is an appeal from a civil contempt adjudication; in such an appeal, the enjoined party asks the appellate court to set aside the contempt adjudication on the ground that the adjudication was based on an invalid injunction.[7] If the court finds that the trial court erred in issuing the injunction, it will set aside the civil contempt adjudication and any sanction that may have been imposed. *See United States v. Koblitz,* 803 F.2d 1523, 1527 (11th Cir.1986). In sum, as long as the appealing party refuses to perform the enjoined act, the controversy will

remain live and consequently will not "evade review."

The majority disagrees with my analysis, stating that "it would be contrary to Supreme Court precedent to dismiss [a] case [for mootness] merely because [the defendant] complied with [the] injunction." *See ante* at 1024. Apparently, in the majority's view, a defendant need not—and in fact should not—disobey an injunctive order merely to ensure appellate review of the order. The majority cites three Supreme Court cases which, it believes, support such a proposition. *See ante* at 1024 (citing *United States v. New York Tel. Co.,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977), *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), and *Carroll v. President & Comm'rs of Princess Anne,* 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968)). These cases are apposite only at first blush. When subjected to a careful reading, they reveal no support for the majority's position.

In *Carroll v. President & Commissioners of Princess Anne,* 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968), officials of the town of Princess Anne, Maryland, proceeding ex parte, sought a temporary restraining order and a permanent injunction in state court barring the National States' Rights Party (NSRP) from holding racist rallies in the town. Town officials contended that NSRP was planning to hold the rallies in the town in the near future, and feared that the rallies, if held, would result in breaches of the peace and other violations of the town's ordinances. The state court issued a ten-day temporary restraining order and, twenty-three days later, a preliminary injunction prohibiting NSRP from holding rallies in the town for a period of ten months. NSRP appealed, and the Maryland Court of Appeals vacated the injunction, which had not yet run its course. *See Carroll v. President & Comm'rs of Princess Anne,* 247 Md. 126, 230 A.2d 452 (Md.1967). The court, weigh-

---

7. In a given case, the enjoined party also might ask the appellate court to vacate the contempt adjudication on the ground that changed circumstances counselled against the contempt ad-

judication and, moreover, may have required the trial court to modify the underlying injunctive order.

ing the need for an injunction against the injunction's infringement on NSRP's first amendment rights, held that the duration of the injunction was unnecessarily long.

NSRP then petitioned the Supreme Court of the United States for a writ of certiorari, presenting the question whether the ex parte granting of the temporary restraining order had denied it due process of law, in violation of the fourteenth amendment. The town, in response, suggested that the case was moot and that the Court dismiss the petition because NSRP had complied with the restraining order, which had long since expired. The Court disagreed with the town, observing that although the order had expired, it "continues to play a substantial role in the response of [town] officials to [NSRP's] activities." 393 U.S. at 178, 89 S.Ct. at 350. Because it could provide NSRP some relief by declaring the restraining order invalid, the Court held that the case was not moot. The Court did not have to reach the question we face: whether the parties' dispute was "capable of repetition yet evading review."

The second case relied upon by the majority is *Nebraska Press Association v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). In that case, a Nebraska state court issued a gag order commanding the news media not to publish prejudicial information concerning a defendant on trial for murder until an impartial jury could be empaneled. The media complied with the order. Meanwhile, the Nebraska Press Association, an association representing members of the media, petitioned the Nebraska Supreme Court for a writ of mandamus—in effect, an injunctive order—directing the trial court to lift the gag order. The supreme court denied the petition, and before the association could obtain review of the decision in the United States Supreme Court, the jury was empaneled, and the gag order was lifted. The Court, responding to the suggestion that the case had become moot, held that article III did not preclude it from reviewing the Nebraska Supreme Court's decision because the controversy the decision had resolved was "capable of repetition yet evading review."

*Nebraska Press Association* thus did not involve the *grant* of injunctive relief, but rather the *denial* of such relief. Contrary to the majority's assertion, then, *Nebraska Press Association* stands only for the proposition that the *denial* of an injunction may evade review, a proposition that has no application here.

The last case cited by the majority is *United States v. New York Telephone Co.*, 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977). In that case, the Federal Bureau of Investigation (FBI) wished to install a pen register on a suspect's telephone line, and the United States Attorney applied to the district court for an order directing the New York Telephone Company to assist the FBI in installing the device. No "case or controversy" concerning the matter was pending against the telephone company at the time, and the United States Attorney did not request the court to make it a party to the proceeding he had initiated. In essence, what the government was seeking was not an adjudicative order, but an administrative directive. The district court granted the government's application and issued the directive. The telephone company subsequently refused to comply with the court's directive, and requested leave to intervene in the proceeding. The court granted its request. The telephone company then moved the court to vacate its administrative directive; in effect, it requested the court to enjoin the enforcement of its directive—as if it were an invalid administrative regulation. The court denied the motion. The telephone company appealed the ruling, but, pending appeal, complied with the order, ending the controversy.

The court of appeals, without discussing the obvious mootness problem, reached the merits of the case and reversed, holding that the district court should have granted the telephone company relief. *See Application of the United States in the Matter of an Order Authorizing the Use of a Pen Register*, 538 F.2d 956 (2d Cir.1976). The Government thereafter sought review in the Supreme Court. The Court recognized that the case appeared to be moot because of the telephone company's compliance

with the district court's directive, but nevertheless held that the matter was reviewable because it fell within the category of cases that are "capable of repetition yet evading review" and therefore not treated as moot. *See New York Tel. Co.,* 434 U.S. at 165 n. 6, 98 S.Ct. at 368 n. 6.

*New York Telephone Co.,* like *Nebraska Press Association,* thus involved a challenge to the denial, rather than the grant, of an adjudicative injunctive order. Both cases stand for the proposition that denial of relief may "evade review" and are therefore inapposite to the case before us.

The "capable of repetition, yet evading review" doctrine was fashioned to do justice in cases in which injunctive relief has been denied, the party seeking the relief has been injured, and it can reasonably be expected that he will be injured again by his adversary unless the appellate court intervenes. To illustrate this point, I posit such a case. Assume that a party will suffer irreparable injury at the hands of a wrongdoer unless the district court enjoins the wrongdoer to perform a certain act. The court denies the party's request for injunctive relief, and he appeals. Pending the appeal, the party suffers irreparable injury, such that a decision reversing the district court and requiring the wrongdoer to perform the act would provide him no relief. In other words, the case appears to be moot.[8] Assume, however, that the dispute between the parties is likely to recur. If the appellate court dismisses the appeal as moot, thus leaving intact the district court's decision, it should expect that when the dispute recurs, and suit is brought, the district court will adhere to its earlier decision and deny relief. The appellate court should also expect that if an appeal ensues and the irreparable injury is suffered before a decision on the merits can be reached, it will, once again, dismiss the appeal as moot. In short, as long as the appellate court views this recurring controversy as having ended—because it can no longer provide the injured party any relief—the district court's ruling, even if erroneous, will stand unreviewed.

The federal courts have solved this dilemma by holding that a case is not moot if it is "capable of repetition yet evading review." This solution, first employed by the Supreme Court in *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911), enables a court to exercise jurisdiction over a narrow class of cases, which includes, in particular, the hypothetical scenario I have posited. *See, e.g., Dunn v. Blumstein,* 405 U.S. 330, 333 n. 2, 92 S.Ct. 995, 998 n. 2, 31 L.Ed.2d 274 (1972); *Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969).

---

8. An example of such a case is *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). In that case, the plaintiff, Jane Roe, then a pregnant single woman, brought a class action in the district court in 1970 on behalf of herself and all other women similarly situated, i.e., single and pregnant. In her complaint, she named the Dallas County, Texas, district attorney as the defendant, and requested the court to enjoin him from enforcing the Texas anti-abortion statute against them on the ground that it abridged their constitutional right to privacy. The three-judge district court denied Roe's application, and Roe applied to the United States Supreme Court for a writ of certiorari. The Court granted the writ, and the case was argued in 1971, well over a year after the complaint was filed.

The county district attorney contended that because no member of the plaintiff class was still subject to a 1970 pregnancy, the case was moot. The Court agreed, but nonetheless held that the plaintiff's appeal from the district court's denial of injunctive relief "evaded review":

[W]hen, as here, pregnancy is a significant fact in the litigation, the normal 266–day human gestation period is so short that the pregnancy will come to term before the usual appellate process is complete. If that termination makes a case moot, pregnancy litigation seldom will survive much beyond the trial stage, and appellate review will be effectively denied. Our law should not be that rigid. Pregnancy often comes more than once to the same woman, and in the general population, if man is to survive, it will always be with us. Pregnancy provides a classic justification for a conclusion of nonmootness. It truly could be "capable of repetition, yet evading review."

*Id.* at 125, 93 S.Ct. at 713. Another example of a case in which the denial of an injunction evades review is *Nebraska Press Association v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), discussed at length in the text following note 7, *supra.*

The case before us, I submit, does not fall within that narrow class, for CWA's claim that the district court erred in granting NBC injunctive relief does not evade review. CWA had the unfettered power to obtain appellate review of the district court's order. All that it had to do to obtain review was to refuse to comply with the order. Instead, it chose to comply and, in effect, to abandon its appeal. The majority errs in entertaining CWA's appeal, and I therefore dissent.